**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**NEW CINGULAR WIRELESS, PCS, LLC** — **CIVIL ACTION**

**VERSUS** — **NO. 25-736-JWD-RLB**

**IBERVILLE PARISH, LOUISIANA, ET AL.**

**RULING AND ORDER**

This matter comes before the Court on the *Motion for Partial Summary Judgment* (the "*MPSJ*") (Doc. 21) filed by Plaintiff New Cingular Wireless, PCS, LLC d/b/a AT&T Mobility ("Plaintiff" or "AT&T"). Defendants Iberville Parish, Louisiana ("the Parish"); Iberville Parish Government ("the Parish Government"); Iberville Parish Council ("the Council"); and Parish President Chris Daigle ("Daigle") (collectively, "Defendants") oppose the motion. (Doc. 23.) Plaintiff has filed a reply. (Doc. 24.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the *MPSJ* is granted.

## I. Relevant Background

This case arises from the denial of an application to construct a wireless telecommunications facility on property in Iberville Parish. (Doc. 1 at ¶ 1.) AT&T filed suit against Defendants in this Court pursuant to 28 U.S.C. § 1331, 47 U.S.C. § 332(c)(7)(B)(v), and 28 U.S.C. §§ 2201–02. (*Id.* at ¶ 14.) The *Complaint* raises three issues under the Telecommunications Act of 1996 ("the TCA"): (1) failure to comply with the substantial evidence requirement; (2) effective prohibition of the provision of personal wireless services; and (3) unreasonable discrimination among providers of functionally equivalent services. (*Id.* at ¶¶ 78–108.) AT&T seeks injunctive and declaratory relief. (*Id.* at ¶¶ 85–86, 98–99, 107–08.)

AT&T now moves for summary judgment on the "substantial evidence" issue raised in Count I of the *Complaint*. (Doc. 21.) The *MPSJ* requests a judgment declaring that Defendants violated 47 U.S.C. § 332(c)(7)(B)(iii), "directing Defendants to grant all permits and approvals necessary to erect the proposed wireless communications tower," and estopping Defendants from preventing the construction and operation of the proposed telecommunications tower (the "Proposed Tower"). (*Id.* at 1–2.) The record reflects the following facts relevant to the Court's inquiry:

"AT&T is a telecommunications carrier and provider of personal wireless services" that "in an effort to provide and improve wireless coverage and capacity," has been working "for several years" to construct the Proposed Tower in the Parish. (Doc. 21-11 at ¶ 1 (citing Doc. 1 at ¶¶ 31–48; Doc. 21-2 at ¶ 4; Doc. 21-7 at 95; Doc. 21-8 at 1–2).) AT&T submitted an Application for Special Use Permit (the "Application") on April 21, 2025, seeking approval and permitting for the location and construction of the Proposed Tower, which would be a 265-foot self-support tower with a 10-foot lightning rod. (*Id.* at ¶ 2 (citing Doc. 1 at ¶ 1, 39–44; Doc. 21-2 at ¶¶ 4, 19–21; Doc. 21-7 at 54–55).)

The suggested location for the Proposed Tower is 60375 Bayou Road, Plaquemine, Louisiana, 70764, which is "adjacent to agricultural fields and commercial uses." (*Id.* (citing Doc. 1 at ¶ 1, 39–44; Doc. 21-2 at ¶¶ 4, 19–21; Doc. 21-7 at 54–55).) A "barn/shed" is "on the parent parcel at 60375 Bayou Road" and is within 265 feet of the Proposed Tower location. (*Id.* at ¶ 3 (citing Doc. 21-4 at 3); Doc. 23-7 at ¶ 3.) The Proposed Tower would be at least 265 feet away from all other "structures and public roadways." (Doc. 21-11 at ¶ 3 (citing Doc. 21-4 at 3).) At the Parish's request, AT&T obtained letters of no objection to the Proposed Tower from the two adjacent property owners. (*Id.* at ¶ 4 (citing Doc. 21-2 at ¶ 6; Doc. 21-3 at 64–69).)

On May 15, 2025, AT&T supplemented the Application with revised drawings. (*Id.* at ¶ 6 (citing Doc. 21-2 at ¶ 7; Doc. 21-3 at 78–80; Doc. 21-4 at 1–39; Doc. 21-5 at 1–25).) On May 20, 2025, the Parish Council Planning and Development Advisory Board[1] (the "Board") "approved introduction of the Application for further consideration at its June 17, 2025 meeting" ("the June Board meeting"). (Doc. 21-11 at ¶ 7 (citing Doc. 21-2 at ¶ 10; Doc. 21-5 at 26–29).)

**A. *The June Board Meeting***

The Board "took up consideration of the Application" on June 17, 2025. (*Id.* at ¶ 8 (citing Doc. 21-2 at ¶ 11; Doc. 21-7 at 78–80).) During the June Board meeting, "one or more Parish representatives acknowledged that the Application met all requirements of the Iberville Parish Unified Development Code" (the "UDC"). (*Id.* at ¶ 9 (citing Doc. 21-8 at 2–3; Doc. 21-7 at 79).)

Laura Carlisle, counsel for AT&T, appeared at the meeting and spoke on AT&T's behalf. (Doc. 21-1 at 10 (citing Doc. 21-7 at 95–96); Doc. 23 at 2; Doc. 23-3 at 15.) The Board's chairman, Randall Dunn, ("Chairman Dunn") (Doc. 21-7 at 78) discussed the fall zone with Carlisle and stated that if a structure was within the fall zone, the Board would want the landowner's permission for the construction of the tower. (Doc. 23-3 at 17.) He also stated that "there can be no new residential construction in the fall zone." (*Id.*) At the Chairman's prompting, Court Bradford, a Parish representative (*see* Doc. 21-11 at ¶ 9 (citing Doc. 21-8 at 2–3; Doc. 21-7 at 79)), stated the review process was complete, everything with the Application was in order, and the Application met all requirements of the UDC. (Doc. 23-3 at 20; Doc. 21-7 at 79.)

Parish resident Doris Bellot spoke in opposition to the Proposed Tower. (Doc. 23-3 at 21–25; Doc. 21-7 at 79.) Bellot complained that the Proposed Tower would be "in the direct line of the vision" from her house. (Doc. 23-3 at 22.) She also asserted that her house's value would

[1] The record also refers to this board as the "Iberville Parish Council Advisory Board for Planning and Development." (Doc. 21-7 at 77.)

depreciate "anywhere from 9.78 percent to 20 percent" if the Proposed Tower were constructed. (*Id.*) She reasoned that she would not have bought the house if the Proposed Tower was in place, so she would not expect someone else to "be jumping at the opportunity" to buy the house from her if the Proposed Tower were erected. (*Id.*) Bellot also indicated that she brought printouts from her research on the EF waves and emissions that would come from the Proposed Tower. (*Id.*) She raised concerns regarding the potential health effects from being near the EF waves. (*Id.* at 22–23.)

Blair Guerin also spoke in opposition to the Proposed Tower. (Doc. 23-3 at 25–27; Doc. 21-7 at 80.) Guerin claimed people and animals were living in the barn on the parent parcel. (Doc. 23-3 at 26.) He asserted that a Parish ordinance "says nothing within that fall zone." (*Id.*) He also said his "biggest concern" was why AT&T chose that location when there is so "much open property" in the Parish. (*Id.*) He raised "medical reasons" and depreciation of property values as reasons why the Parish has "way too much property for this [tower] to be stuck up against a neighborhood." (*Id.*)

Daigle spoke next. (*Id.* at 27.) He stated that according to his research, "existing buildings within the fall zone are okay" under the UDC if "the landowners are agreeing to it." (*Id.* at 27–28.) Chairman Dunn agreed with Daigle. (*Id.*)

Councilman Thomas Dominique ("Councilman Dominique") (Doc. 21-7 at 78) indicated that AT&T should "look for another site" for the Proposed Tower because "we have some very, very concerned people about their way of living, about what could happen in the future." (Doc. 23-3 at 29.) Carlisle responded that the specific reasons for opposition seemed to be "aesthetics," "perceived health effects of RF emissions," and the effect on home values. (*Id.* at 30.) She asserted that the first two reasons are prohibited by federal law. (*Id.*) She also stated that countless studies

and her own work in another parish have shown that telecommunications towers have "no discernable and no negative affect [sic] on neighboring property values." (*Id.*)

Councilwoman Chasity Easley ("Councilwoman Easley") (Doc. 21-7 at 78) stated that "a lot of" residents feel the same way as Doris Bellot. (Doc. 23-3 at 31–32.) Councilwoman Chasity Martinez ("Councilwoman Martinez") (Doc. 21-8 at 25) asserted that she received "numerous phone calls from these residents that do not want this." (Doc. 23-3 at 32.) She also stated that she had "numerous issues with AT&T" regarding power lines at a different location, so she was concerned with upkeep of the Proposed Tower. (*Id.* at 33–34.) Chairman Dunn asserted that the UDC prohibits "adversely affect[ing] the adjacent property owner's property value" and that the Board probably needed to look at what effect the Proposed Tower would have on property values. (*Id.* at 35–36.)

After this discussion, the Board made no motion on the Application. (Doc. 23-3 at 37; Doc. 21-7 at 80; Doc. 21-11 at ¶ 10 (citing Doc. 21-8 at 20; Doc. 21-7 at 80).) The discussion of the Application during the June Board meeting was recorded and is reflected in the meeting's transcript. (Doc. 21-11 at ¶ 11 (citing Doc. 21-7 at 81–97; Doc. 21-8 at 1–22; Doc. 21-2 at ¶ 13).)

**B. *The June Council Meeting***

Immediately after the June Board meeting, the Council "took up consideration of the Application at its regular meeting" ("the June Council meeting"). (*Id.* at ¶ 12 (citing Doc. 21-2 at ¶ 14; Doc. 21-8 at 23–24, 25–32).) No members of the public spoke or presented information in opposition to the Application at the June Council meeting. (Doc. 21-8 at 31–52; Doc. 23-4.) Carlisle, appearing on AT&T's behalf, acknowledged that residents raised concerns at the Board meeting and asked that if the Council wanted more information about those concerns, the consideration of the Application be deferred for a month. (Doc. 23-4 at 5.) Councilwoman

Shalanda Allen ("Councilwoman Allen") (Doc. 21-8 at 25) responded, saying she was at the Board meeting and that only two residents spoke at that meeting. (Doc. 23-4 at 5–6.) She informed the Council that one resident said she did not want to see the Proposed Tower outside her front door, and she also relayed Councilman Dominique's suggestion that AT&T look elsewhere. (*Id.* at 6.) Councilwoman Martinez and Councilman Dominique both stated that the residents "do not want" the Proposed Tower. (*Id.* at 9.) After a motion was made to approve the Application, the Council members began discussing the opposition to the Application. (*Id.* at 10.)

Councilman Hunter Markins ("Councilman Markins") (Doc. 21-8 at 25), who was not at the June Board meeting, asked why the residents opposed the Proposed Tower. (Doc. 23-4 at 10–11.) Again, Councilwoman Allen clarified that only two people spoke at the Board meeting, and she stated one of them did not want to see the Proposed Tower outside her home. (*Id.* at 11.) Councilwoman Martinez stated she received calls from residents who took issue with the location and raised health concerns. (*Id.* at 11–12.) She "didn't get one good call about it," and the area's residents "just did not want it in their area." (*Id.* at 12.) She also asserted that residents "did research" and contacted "several real estate agents and they did tell them that [the Proposed Tower] would depreciate the value of their homes." (*Id.* at 13.) Carlisle countered that the information Councilwoman Martinez mentioned was not on the record at the Board meeting. (*Id.*) Councilwoman Easley informed the Council about the assertion that someone might be living in the barn. (*Id.* at 14.)

The Parish's attorney Evan Alvarez ("Alvarez") then informed the Council that voting "yes" on the motion would approve the Application, and voting "no" would reject the Application. (*Id.* at 16.) The Council voted against approval of the Application with nine "no" votes, one "yes" vote, and two abstentions. (Doc. 21-11 at ¶ 14 (citing Doc. 21-8 at 31–32); Doc. 23-4 at 17–18.)

Accordingly, the motion to approve the Application failed. (Doc. 21-8 at 31–32.) The Council's discussion of the Application is recorded and reflected in the meeting's transcript. (Doc. 21-11 at ¶ 15 (citing Doc. 21-8 at 33–52; Doc. 21-2 at ¶ 17).)

**C. *The July Council Meeting***

On July 15, 2025, AT&T appeared before the Council at its regular meeting ("the July Council meeting") to request reconsideration of the Application. (*Id.* at ¶ 17 (citing Doc. 21-2 at ¶¶ 18–19; Doc. 21-10 at 52–53, 54–85).) Members of the public and the Council voiced opposition to the Proposed Tower, with their reasons being (1) past trouble working with AT&T; (2) not wanting to see the tower from their houses; (3) the alleged effect on property values; (4) the availability of other potential locations; (5) the barn potentially being used as a residence; and (6) the potential for hazardous waste if the Proposed Tower falls on a pipeline. (Doc. 23-5 at 4–11, 17–18.) At least one resident acknowledged the "high need for an AT&T tower," but objected to having the tower near her house because it would "violate the nature and the views." (*Id.* at 7.) AT&T's representatives responded to these concerns. (*Id.* at 11–21.)

The Council's chairman Steve Smith ("Chairman Smith") (Doc. 21-8 at 25) called for a motion and a second. (Doc. 23-5 at 25.) Members of the Council questioned why they would vote on the Application when they "voted on it last month," and stated, "We were just here to hear them." (*Id.*) Alvarez informed the Council that the Application "was voted down last month," but "the administration made the decision" to put the Application on the meeting's agenda because of the "legal issues" and because a lot of the members did not have much information about the issue during the June Council meeting. (*Id.* at 25–26.) He stated that the denial vote from the June Council meeting "still stands." (*Id.* at 26, 30.) He further explained that if there were a vote to approve and it failed, that would be a denial, just like at the June Council meeting. (*Id.* at 26–27.)

No member of the Council moved to approve the project, so Alvarez and Chairman Smith informed the Council that the previous denial "stands as it is" and "nothing has changed from the end of" the June Council meeting. (*Id.* at 30–31.) The discussion at the July Council meeting is recorded and reflected in the meeting's transcript. (Doc. 21-11 at ¶ 19 (citing Doc. 21-10 at 54–85; Doc. 21-2 at ¶ 21).)

**D. *The Letter***

On July 24, 2025, Alvarez provided AT&T's counsel with copies of the minutes from the June Board meeting and the June Council meeting. (*Id.* at ¶ 20 (citing Doc. 21-2 at ¶ 22).) On July 28, 2025, Daigle sent a letter to AT&T ("the Letter") providing background information about the Application and reasons for the Application's denial. (Doc. 21-10 at 99–102; Doc. 23-1.) The Letter summarized the three meetings during which the Application was discussed. (Doc. 23-1.) It asserted that residents at the June Board meeting opposed the Proposed Tower due to its "proximity to the [Bayou Estates] subdivision." (*Id.* at 1–2.) Regarding the June Council meeting, the Letter stated the Council members, many of whom were not at the June Board meeting, "were concerned as to the opposition voiced, by the public, during" that Board meeting, and they, therefore, voted against the Application. (*Id.* at 2.) "Thus, AT&T's application for the permit was rejected, by the Parish Council, on June 17, 2025." (*Id.*)

The Letter expressed "concern that many Councilmembers did not have sufficient knowledge about the proposed project at the time it was voted upon," which was why the Application was raised again at the July Council meeting. (*Id.*) The Letter goes into detail about the discussions and evidence from the July Council meeting. (*Id.* at 2–3.) The Parish residents' concerns included (1) prior issues working with AT&T; (2) the Proposed Tower's effect on the "serene views" in the nearby Bayou Estates subdivision; (3) general opposition from the

subdivision's residents, as evidenced by a signed petition; (4) the purported negative effect on property values; (5) proximity to the subdivision; (6) the barn that "has been used as a dwelling"; and (7) potential safety issues posed by the Proposed Tower's proximity to pipelines. (*Id.*) The Letter addressed AT&T's responses to these concerns. (*Id.* at 3.) The Letter stated, "No one present, at the meeting, identified themselves as being in favor of the project." (*Id.*) But an "overwhelming majority" of the audience opposed the project. (*Id.*) The Letter asserted that "no member moved to approve the project," so "the matter failed." (*Id.*)

The Letter specifically listed the Council's "concerns" about the Application: (1) proximity to the subdivision; (2) effects on the subdivision's "aesthetics and historical views"; (3) the effect on property values; (4) the testimony that the barn "was being used as a dwelling"; (5) the amount of opposition from residents; and (6) "the fact that not one member of the public appeared in support of the project." (*Id.*) Plaintiff filed this lawsuit on August 13, 2025. (Doc. 1.)

## II. Legal Standards

### A. *Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the mover bears his burden of showing that there is no genuine issue of fact, his "opponent must do more than simply show that there is some metaphysical doubt as to the material

facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Though the court considers "the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant, the nonmoving party may not rest on the mere allegations or denials of its pleadings but must respond by setting forth specific facts indicating a genuine issue for trial." *AIS Designs Co. v. J.J.S. Custom Built Homes, Inc.*, No. 24-0837, 2025 WL 1382871, at *2 (S.D. Tex. May 13, 2025) (quoting *Goodson v. City of Corpus Christi*, 202 F.3d 730, 735 (5th Cir. 2000)). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

**B. *Telecommunications Act of 1996***

"No one wants a wireless communications tower placed in his neighborhood. But everyone wants – and our economy depends in large part upon – consistently reliable and affordable wireless service." *PI Tower Dev., LLC v. Charter Twp. of Chesterfield*, 574 F. Supp. 3d 480, 482 (E.D. Mich. 2021). The TCA is Congress's attempt to balance these competing interests. *Id.* The TCA "generally preserves 'the traditional authority of state and local governments to regulate the location, construction, and modification' of wireless communications facilities like cell phone towers, but imposes 'specific limitations' on that authority." *T-Mobile S., LLC v. City of Roswell, Ga.*, 574 U.S. 293, 300 (2015) (quoting *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 2005)). "Any decision by a State or local government or instrumentality thereof to deny a

request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). The written reasons "need not be elaborate or even sophisticated, but rather ... simply clear enough to enable judicial review." *New Cingular Wireless PCS LLC v. City of Jennings, La.*, No. 2:23-CV-01769, 2024 WL 4507832, at *2 (W.D. La. Oct. 16, 2024) (ellipsis in original) (quoting *T-Mobile S., LLC*, 574 U.S. at 302).

The TCA does not define "substantial evidence," but it is "a legal term of art." *U.S. Cellular Corp. v. City of Wichita Falls, Tex.*, 364 F.3d 250, 255 (5th Cir. 2004). "The substantial evidence standard under the TCA is the same as the traditional substantial evidence standard used by courts to review agency decisions." *Alltel Corp. v. City of Jackson, Miss.*, 466 F. Supp. 3d 673, 677 (S.D Miss. 2020). Therefore, "'substantial evidence' is 'such reasonable evidence that a reasonable mind would accept to support a conclusion.'" *U.S. Cellular Corp.*, 364 F.3d at 255 (quoting *Poly-America, Inc. v. NLRB*, 260 F.3d 465, 476 (5th Cir. 2001)). Finding substantial evidence requires "more than a mere scintilla and less than a preponderance." *Id.* "The reviewing court 'must take into account contradictory evidence in the record.'" *Id.* at 256 (quoting *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523 (1981)). However, the substantial evidence review is highly deferential, so the reviewing court "may not 're-weigh the evidence or substitute [its] judgment' for the judgment of the local government." *Id.* (quoting *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)). The plaintiff bears the burden of proving that the local government's decision is not supported by substantial evidence. *Id.*

In cases under the TCA, "the substantial evidence standard limits the types of reasons that a zoning authority may use to justify its decision." *Id.* Generalized concerns about aesthetics or property values do not constitute substantial evidence. *Id.* And "the placement, construction, and

modification of personal wireless service facilities" may not be regulated "on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv). Additionally, a challenged decision must "accord with applicable local zoning law." *U.S. Cellular Corp.*, 364 F.3d at 256. Thus, the court must determine whether the zoning authority "had some reasonable evidence, beyond mere generalized concerns, to support the reasons it gave for applying its zoning standards the way it did." *Id.*

## III. Discussion

### A. *Parties' Arguments*

#### 1. Plaintiff's Memorandum in Support (Doc. 21-1)

Plaintiff argues that summary judgment is warranted on its claim under 47 U.S.C. § 332(c)(7)(B)(iii) because "[t]here is no dispute of material fact that Defendants' denial of AT&T's Application lacked substantial evidence." (Doc. 21-1 at 20.) "Substantial evidence" under the TCA "requires more than a mere scintilla and less than a preponderance." (*Id.* (quoting *U.S. Cellular Corp.*, 364 F.3d at 255–56).) The local government must have reasonable evidence beyond generalized concerns to support its decision. (*Id.* at 20–21.) Neither concerns over health effects of radio frequency emissions nor general concerns about aesthetics and property values constitute substantial evidence. (*Id.*) Additionally, the mere fact that some residents object to an application, on its own, is not a valid reason to deny the application. (*Id.* at 23.) When ruling on a question of substantial evidence, "a court should view the record in its entirety, including evidence 'unfavorable to the state or local government's decision.'" (*Id.* at 21 (quoting *Preferred Sites, LLC v. Troup Cty.*, 296 F.3d 1210, 1218 (11th Cir. 2002)).)

The Council denied the Application on June 17, 2025, so the Court's review of the denial "is limited to the evidence in the record and the reasons asserted by the Council" when it denied the Application on June 17, 2025. (*Id.* at 21–22 (citing *Alltel Corp.*, 466 F. Supp. 3d at 681).) The written record includes, at most, the minutes and transcript from the June Council meeting and the June Board meeting. (*Id.* at 22.) The Letter, which was issued six weeks after the June Council meeting, is "an obvious attempt to shore up the Council's denial of the Application." (*Id.*) The Letter also mainly focuses on the July Council meeting, but the denial occurred at the June Council meeting. (*Id.*) The July Council meeting changed nothing from the June Council meeting. (*Id.*) "Defendants' July 28, 2025 letter violates the requirement that a locality's reasons be provided in writing at the time of the denial and is an attempt to support the Council's denial of the Application with rationalizations constructed after the fact." (*Id.*)

The Application denial on June 17, 2025, lacked substantial evidence, which was "all but acknowledged by the Parish attorney" when he recommended that the Council "revisit that decision and consider additional information." (*Id.*) The only evidence before the full Council at the June Council meeting was the Application, a confirmation that the Application met all local zoning ordinance requirements, "Councilmembers Allen's, Dominique's, and Martinez's opposition to the Proposed Tower due to the mere fact of public opposition," and constituent complaints relayed to the Council by certain Council members who were present at the June Board meeting. (*Id.* at 22–23.) Additionally, the discussions at the June and July Council meetings were the same, so Defendants did not have substantial evidence to support denying the Application. (*Id.* at 24.) Summary judgment is appropriate because "the Council lacked substantial evidence for its June 17, 2025 denial of the [sic] AT&T's Application." (*Id.*) Plaintiff, therefore, asks the Court to

grant its request for injunctive relief and to order Defendants to "issue all approvals and permits necessary for construction of the Proposed Tower." (*Id.* at 25.)

2. Defendants' Response (Doc. 23)

Defendants respond that AT&T incorrectly claims the substantial evidence review should not include the July Council meeting or the Letter. (Doc. 23 at 12 (citing Doc. 21-1 at 17–18).) Defendants argue the July Council meeting constitutes "the denial of the application," and therefore, the reasons discussed in that meeting and in the Letter "must be used when determining whether the denial was based on substantial evidence." (*Id.*) The reasons in the Letter are "virtually identical" to those stated during the June Council Meeting because the Letter "is meant to act as the official denial letter for the same matter" considered at both the June and July Council meetings. (*Id.* at 13.) The Letter "clarifies the reasons for the denial which were 'the reasons asserted by the locality when it made the decision to deny the application.'" (*Id.* (quoting *Alltel Corp.*, 466 F. Supp. 3d at 681).)

Though written reasons for a denial generally must be issued essentially contemporaneously with a denial, untimely written reasons can be considered if they are the same as those asserted when the locality decided to deny the application. (*Id.* at 13–14 (quoting *T-Mobile S., LLC*, 574 U.S. at 295; *Alltel Corp.*, 466 F. Supp. 3d at 681).) No letter was issued after the June Council meeting because the Parish and Plaintiff decided to reconsider the Application at the July Council meeting. (*Id.* at 14 (citing Doc. 23-2 at ¶ 4).) Thus, "it was unnecessary to provide written reasons immediately following the June meeting." (*Id.* (citing Doc. 23-2 at ¶ 6).) Defendants informed AT&T of the July Council meeting's purpose, and AT&T attended and participated in that meeting. (*Id.* (citing Doc. 23-2 at ¶¶ 4–5).) "AT&T cannot now pretend the meeting never

occurred." (*Id.*) Therefore, the Letter "clearly relayed the substantial evidence used by the Parish in denying AT&T's application." (*Id.*)

Even if the Court cannot consider the Letter and the July Council meeting, the reasons given at the June Council meeting "were more than enough to constitute substantial evidence supporting the Parish Council's denial of the application." (*Id.*) These reasons were (1) negative aesthetic effects; (2) other available locations on uninhabited land; (3) popular opposition; (4) health concerns regarding the emissions; (5) potential depreciation of home values; and (6) the barn in the fall zone being inhabited. (*Id.* at 14–15 (citing Doc. 23-4 at 6, 12–14).)

First, aesthetics and property values "can constitute substantial evidence" if they are not mere "generalized concerns." (*Id.* at 15 (quoting *Southwest Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 61 (1st Cir. 2001), *abrogated by T-Mobile S., LLC v. City of Roswell, Ga.*, 574 U.S. 293 (2015)[2]).) In this case, the concerns were not generalized. (*Id.*) At the June Board meeting, a resident "made clear that the tower would be more than just a mere aesthetic nuisance, noting that if the tower was built, 'it's in my front yard.'" (*Id.* at 15–16 (quoting Doc. 23-3 at 22).) This point was reiterated at the June Council meeting. (*Id.* at 16, n. 63 (citing Doc. 23-4 at 6, 13).) During the June Board meeting, the same resident also "provided specific numbers," based on her own research, "for how much her property value may be lowered." (*Id.* at 16 (citing Doc. 23-3 at 22).) This concern is not generalized but instead a concern the resident "maintained after having researched the particular effects the cell tower would have on the value of her particular property." (*Id.*) AT&T "attempted to counter this concern" by stating that "countless studies" show cell towers do not lower property values, but it did not specifically indicate which studies. (*Id.* (citing Doc. 23-3 at 30–31).)

---

[2] The Court notes that Defendants did not include this subsequent history in any of its references to this case.

Second, a concern that other suitable land is available for the tower's construction "is a valid concern on which substantial evidence for a denial can be found." (*Id.* at 17.) At the June Council meeting, AT&T did not "make clear that it had conducted a full evaluation of alternative sites and determined that the alternatives were not feasible." (*Id.* at 18 (citing Doc. 23-4 at 14).) The proposed location "is surrounded by vacant farmland which would be just as suitable to build the tower upon." (*Id.*)

Third, "public opposition is a valid concern that can constitute substantial evidence." (*Id.*) "[W]idespread public opposition to the construction of a telecommunications tower provides substantial evidence to support a local government's denial of a permit." (*Id.* (quoting *USCOC of Va. RSA #3, Inc. v. Montgomery Cnty. Bd. of Supervisors*, 343 F.3d 262, 272 n.8 (4th Cir. 2003)).) The public had "significant opposition" to AT&T's proposed cellular tower. (*Id.* (citing Doc. 23-1).) Council members at the June Council meeting were concerned about the residents' opposition voiced during the June Board meeting. (*Id.*) "This popular support was evident by the two individual residents who spoke" at the June Board meeting, "as well as numerous residents 'blowing up' Councilwoman Martinez's phone stating that they did not want the tower to be constructed.'" (*Id.* at 19 (citing Doc. 23-4 at 12).)

Fourth, Defendants were also concerned about "the possibility of someone residing in the barn on the property on which the proposed cell tower was to be constructed." (*Id.*) The UDC states, "Any site with a residential unit located within the fall zone will not be approved for construction." (*Id.* (quoting Unified Dev. Code art. 7.A-6.1.1).) Thus, if someone was living in the barn near the proposed location for the tower, the tower's construction would violate the UDC. (*Id.*) A Parish resident testified at the June Board meeting that someone was living in the barn, and this concern was mentioned again at the June Council meeting. (*Id.* (citing Doc. 23-3 at 26; Doc.

23-4 at 14).) AT&T did not counter this testimony. (*Id.* at 19–20 (citing Doc. 23-4).) "Whether someone resides in the property constitutes a dispute of material fact," and the possibility of a person living in the barn "would necessarily constitute substantial evidence for the denial of the application." (*Id.* at 20.)

Fifth, "Defendants do not contest that the health concerns do not support a finding of substantial evidence." (*Id.*) The TCA prohibits denials "based on 'the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.'" (*Id.* (quoting 47 U.S.C. § 332(c)(7)(B)(iv)).) However, the other reasons discussed above raise a dispute of material fact regarding whether the denial was based on substantial evidence. (*Id.*) If one of the enumerated concerns constitutes substantial evidence, "then the court must find that the denial was supported by substantial evidence." (*Id.* (citing *Southwest Bell Mobile Sys., Inc.*, 244 F.3d at 62).)

3. Plaintiff's Reply (Doc. 24)

Plaintiff claims Defendants misstated the standard applicable to Count I. (Doc. 24 at 2.) The Court's review of the denial decision is "limited to the evidence in the administrative record and to the reasons asserted by the locality when it made the decision to deny the application." (*Id.* (quoting *Alltel Corp.*, 466 F. Supp. 3d at 681).) Substantial evidence claims, therefore, are routinely decided on summary judgment. (*Id.* at 3.) "Defendants do not dispute the contents of the record below, and there has been no allegation of procedural irregularity." (*Id.*) "The only question before the Court is whether there is substantial evidence in the written record for Defendants' denial of AT&T's Application." (*Id.*)

The Council denied the Application at the June Council meeting, "not four weeks later when it refused to reconsider the Application or six weeks later when the Parish President, plainly

aided by counsel, sent AT&T a letter purporting to summarize the reasons for denial." (*Id.* at 4.) Though Defendants attempt to characterize the July Council meeting as a denial of the Application, "the record speaks for itself." (*Id.*) The Parish's attorney recommended that the Application be reconsidered at the July Council meeting, but the Council refused. (*Id.* (citing Doc. 21-10 at 77–79).) Alvarez made this recommendation because "he and the Parish President knew the Council lacked sufficient information for having denied the Application." (*Id.* (citing Doc. 21-10 at 78–79, 100).)

Most of the Council members at the June Council meeting were not present at the June Board meeting, and they, therefore, did not hear the residents' testimony as to why they opposed the proposed tower. (*Id.* (citing Doc. 21-8 at 38–46).) The only information those Council members had regarding the June Board meeting discussions was what Council members Allen, Martinez, and Easley reported. (*Id.* (citing Doc. 21-8 at 38–46).) Plaintiff again argues that other than the Application and a confirmation that it met the local requirements, secondhand constituent complaints and Council members' opposition premised on "the mere fact of public opposition" were the only "evidence" before the Council at the June Council meeting. (*Id.* at 5.) No members of the public attended or spoke at the meeting. (*Id.*) "On this basis alone, the Court should grant summary judgment in AT&T's favor." (*Id.*)

Additionally, the *Opposition*'s reasons for denial "do not constitute substantial evidence for the Council's denial of the Application." (*Id.*) Complaints that the Proposed Tower would be visible from a resident's front porch and conjecture about potential effects on property value are not substantial evidence. (*Id.*) The claims that property values would decrease due to the Proposed Tower were not supported by reference to any specific studies. (*Id.* (citing Doc. 23 at 2).) "'[U]nsupported statements of opinion' by residents that a proposed tower might affect property

values do not rise to the level of substantial evidence within the meaning of § 332(c)(7)(B)(iii)." (*Id.* at 6 (quoting *Sprint Spectrum, L.P. v. Charter Twp. Of Brandon*, 563 F. Supp. 2d 697, 710 (E.D. Mich. 2008)).) Additionally, concerns that a tower may be unsightly or visible from a neighborhood "are generalized complaints and not substantial evidence." (*Id.* at 5–6 (citing *Gulfstream Towers, LLC v. Brevard Cnty.*, No. 24-11648, 2025 WL 2328155, at *2 (11th Cir. Aug. 13, 2025); *Alltel Corp.*, 466 F. Supp. 3d at 679, 683).) Defendants cite no authority to support their proposition that a resident's "generalized concerns regarding aesthetics" and "unsubstantiated claims regarding property values" rise to the level of substantial evidence. (*Id.* at 7.) The case law shows the contrary: these concerns and claims are not substantial evidence under § 332(c)(7)(B)(iii). (*Id.*)

"The 'mere allegation that other locations [are] available' also is not substantial evidence within the meaning of § 332(c)(7)(B)(iii)." (*Id.* (brackets in original) (quoting *Sprintcom, Inc. v. Vill. Of Mundelein*, No. 98-4451, 1999 WL 652032, at *6 (N.D. Ill. Aug. 20, 1999)).) Defendants do not identify a specific alternative site but instead simply claim that another suitable site must exist nearby based on an aerial map of the area. (*Id.* at 7–8 (citing Doc. 23 at 17).) Such a claim is not substantial evidence. (*Id.* at 8.) Defendants' argument that Plaintiff was required to demonstrate its effort to evaluate alternatives is misplaced because the case Defendants rely on involved a specific local requirement for such a demonstration. (*Id.* (citing *Southwest Bell Mobile Sys., Inc.*, 244 F.3d at 62–63).) Defendants have not identified a similar zoning ordinance that applies to this case. (*Id.* (citing Doc. 23 at 7–18).) Instead, "Defendants previously acknowledged that the Application was complete and *satisfied* all requirements of the UDC." (*Id.* (emphasis in original) (citing Doc. 21-8 at 19–20).) Defendants' argument essentially admits that the Council denied the Application based on a standard that is not in the zoning ordinances or that the Parish

"is manufacturing *post hoc* rationalizations for its denial." (*Id.*) "Both are improper," and the "other suitable land" claim is not substantial evidence. (*Id.*)

As to the "public opposition" issue, public opposition "must be 'based upon rational concerns'" for it to provide substantial evidence to deny an application. (*Id.* at 9 (quoting *USCOC of Va. RSA #3, Inc.*, 343 F.3d at 272 n.8).) As already discussed, the substance of the residents' opposition is not substantial evidence, so the fact that they opposed the proposed tower is not substantial evidence either. (*Id.*)

"'[C]oncerns based upon conjecture or speculation' are 'objectively unreasonable' and thus 'lack probative value and will not amount to substantial evidence.'" (*Id.* (quoting *Petersburg Cellular P'ship v. Bd. of Sup'rs of Nottoway Cnty.*, 205 F.3d 688, 695 (4th Cir. 2000)).) A Parish resident at the June Board meeting speculated that "one or more persons might be residing in the barn/shed" on the property near the tower's proposed location. (*Id.*) Even Defendants admit this "concern" is "pure speculation," so it is not substantial evidence for Defendants' denial. (*Id.* at 10.) Both Chairman Dunn and Daigle stated on the record at the June Board meeting that even if a residential structure was located within the proposed tower's radius, the UDC did not require denial of the Application if the property owner had no objection. (*Id.* (citing Doc. 21-7; Doc. 21-8).) Thus, the speculation on the barn/shed issue is not substantial evidence. (*Id.*) Summary judgment on Count I in favor of AT&T is appropriate. (*Id.*)

**B. *Analysis***

1. Scope of Considerations for Review

For the substantial evidence review, the Court must look at "the considerations underlying the action under review," i.e., the grounds upon which the locality acted. *T-Mobile S., LLC*, 574 U.S. at 301. It is uncontested that the Council denied the Application at the June Council meeting.

(Doc. 21-11 at ¶ 14; Doc. 23-7 at ¶ 14. *See* Doc. 23 at 4 (stating the Application was rejected after a motion to approve failed); Doc. 23-1 at 2 (stating "AT&T's application for the permit was rejected, by the Parish Council, on June 17, 2025.").) Count I, which is the subject of the *MPSJ*, seeks relief from this June denial. (Doc. 1 at ¶¶ 61–63, 70, 82–84.) The parties disagree as to whether the July Council meeting was also a denial and whether the Court can consider that meeting and the Letter in its analysis. At the July Council meeting, the Council did not vote to reconsider the denial from its June meeting. Thus, the Court agrees with Plaintiff that the July Council meeting was not a denial of the Application.

The Council could not have considered evidence compiled or received after the challenged denial vote occurred at the June Council meeting. *See Alltel Corp.*, 466 F. Supp. 3d at 681 (stating the court's substantial evidence review is limited to evidence in the administrative record and the reasons asserted when the locality decided to deny the application); *T-Mobile NE LLC v. City Council of City of Newport News, Va.*, No. 4:10-cv-82, 2011 WL 1086496, at *3 (E.D. Va. Feb. 4, 2011), *report and recommendation adopted*, 2011 WL 1103004, *affirmed*, 674 F.3d 380 (4th Cir. 2012) ("The written record in this case consists of the documents before the City Council on the date of their decision."); *Nextel Commc'ns of Mid-Atlantic, Inc. v. Town of Provincetown*, No. 02-11646, 2004 WL 438800, at *3 (D. Mass. Mar. 10, 2004) (stating that it would be virtually impossible for events occurring after an application's denial to alter a finding that the denial was not supported by substantial evidence). Such evidence, therefore, could not constitute "considerations underlying the action under review." Accordingly, the Court's substantial evidence review will not consider the July Council meeting or the contents of the Letter covering anything after the June Council meeting.

2. <u>Substantial Evidence Review</u>

Plaintiff argues that the only evidence at the June Council meeting was the Application; a confirmation that the Application satisfied the UDC; "Councilmembers Allen's, Dominique's, and Martinez's opposition to the Proposed Tower due to the mere fact of public opposition"; and secondhand versions of constituent complaints. (Doc. 21-1 at 22–23.) Plaintiff concludes the Council, therefore, lacked substantial evidence to deny the Application on June 17, 2025. (*Id.*) Defendants, however, insist the reasons for opposition given at the June Council meeting—i.e., (1) negative aesthetic effects; (2) potential depreciation of home values; (3) other available locations; (4) popular opposition; (5) health concerns; and (6) the potentially inhabited barn—"were more than enough to constitute substantial evidence." (Doc. 23 at 14–15 (citing Doc. 23-4 at 6, 12–14).) Defendants, however, concede that "health concerns do not support a finding of substantial evidence." (Doc. 23 at 20.)

"The TCA's minimum justification standards require that 'the government's decision be supported by evidence that is both substantial and substantiated.'" *New Cingular Wireless PCS LLC*, 2024 WL 4507832, at *4 (citing *Eco-Site, Inc. v. City of Huber Heights, Ohio*, 2018 WL 3092901, at *5 (S.D. Ohio June 22, 2018)). After reviewing the written record from the June Board meeting[3] and the June Council meeting, all the "concerns" raised in opposition to the Proposed Tower were generalized concerns or unsupported speculation.

*a. Aesthetics and Property Values*

Defendants argue that one resident's complaint that she did not want to see the Proposed Tower from her front yard was not a generalized concern. (Doc. 23 at 15–16.) The Court disagrees; this complaint is one that could be raised by anyone living within a line of sight of any proposed

[3] Though most members of the Council did not attend the June Board meeting or have its transcript before them when they made their decision, at least five Council members (Allen, Dominique, Morgan, Easley, and Martinez) were at the Board meeting (*see* Doc. 21-7 at 78; Doc. 23-3 at 2, 32) and therefore, could have considered the events of that meeting when they each voted against approval of the Application. (Doc. 21-8 at 32.)

telecommunications tower. *See New Cingular Wireless PCS LLC*, 2024 WL 4507832, at **4–5 (finding concerns that erecting a tower in a residential area would affect the "small city" feeling and that residents did not want a tower in their neighborhood were general, unsubstantiated concerns); *Vertex Dev., LLC v. Pinellas Cnty., Fla.*, 667 F. Supp. 3d 1136, 1145–46 (M.D. Fla. 2023) (stating aesthetic concerns were generalized grievances when residents complained that the tower would be an eyesore, destroy the residential area's aesthetics, be visible from a resident's house, and obstruct views of the sunset); *Alltel Corp.*, 466 F. Supp. 3d at 682–83 (finding a resident's complaint that a proposed tower was ugly and that he and other residents would have to pass by and see it to be generalized concerns); *Verizon Wireless (VAW) LLC v. Douglas Cnty., Kan. Bd. of Cnty. Com'rs*, 544 F. Supp. 2d 1218, 1249 (D. Kan. 2008) (finding that generic "not in my backyard" complaints about a proposed tower, such as the tower being unsightly and an eyesore and a resident's assertion that he would not have bought the house had he known a tower would be built in view of his window, were generalized and did not constitute substantial evidence).

Additionally, neither the residents nor any Council member presented any evidence to substantiate this concern. Therefore, this aesthetic concern raised in opposition to the Proposed Tower was a generalized concern unsupported by any evidence. The concern about how the Proposed Tower might affect property values is also a general, unsubstantiated concern. Though Defendants claim the resident who raised this issue did research and "provided specific numbers" for how much her property value would decrease, (Doc. 23 at 16 (citing Doc. 23-3 at 22)) the record does not reflect any evidence of research or other support to substantiate the numbers this resident provided. Thus, neither of these concerns satisfies the substantial evidence requirement.

*b. Available Alternative Locations*

Defendants assert that to overturn a denial based on available alternative locations, a telecommunications provider "must" demonstrate its efforts to evaluate alternative locations and show that the alternatives are not feasible. (Doc. 23 at 17 (quoting *Southwest Bell Mobile Sys., Inc.*, 244 F.3d at 62).) The Court finds this assertion is an incorrect statement of the law applicable to this case. The statement Defendants quote regarding this alleged requirement is based on a zoning ordinance for Leicester, Massachusetts. *Southwest Bell Mobile Sys., Inc.*, 244 F.3d at 63 (quoting Leicester, MA., Zoning By-laws § 5.4). No similar ordinance applies to the case before this Court. Thus, no such requirement exists in this case. The allegation that Plaintiff could or should look elsewhere for a new proposed location is a general assertion and no evidence was presented at either meeting to support this assertion. Therefore, the allegation regarding alternative locations does not constitute substantial evidence.

*c. Public Opposition*

Defendants correctly assert that public opposition to a tower can constitute substantial evidence. (Doc. 23 at 18.) However, public opposition is a valid basis for denial only if the reasons for the opposition constituted substantial evidence and those reasons, not merely the fact that the public opposed the project, were why the Council denied the Application. *Alltel Corp.*, 466 F. Supp. 3d at 682. The transcripts from both the June Board meeting and the June Council meeting, as well as Defendants' argument in their *Opposition*, indicate that to the extent the Council based its denial on public opposition, it did so merely based on the fact that there was opposition, not on the substance of the opposition. (*See* Doc. 23-3 at 32 ("I received numerous phone calls from these residents that do not want this. And so I'm supporting them."); Doc. 23-4 at 9 (stating the residents "do not want" the Proposed Tower); Doc. 23-4 at 12 (stating that none of the residents want the Proposed Tower, that Councilwoman Martinez "didn't get one good call about it," and that the

residents "just did not want it in their area"); Doc. 23 at 19 (referencing general public opposition to the Proposed Tower as support for the denial). Thus, public opposition did not constitute substantial evidence to support denial of the Application.

*d. The Potentially Inhabited Barn*

As to the barn, a resident stated at the June Board meeting that people were living in a barn within the Proposed Tower's fall zone. (Doc. 23-3 at 26.) This resident, however, provided no evidence to substantiate this claim. Daigle responded to this concern and said existing buildings, even residential ones, within the fall zone were not a problem if the landowners gave authorization. (*Id.* at 27–28.) No additional information supporting this statement was provided. Councilwoman Easley also informed the Council during the June Council meeting that one of the residents at the Board meeting said that "they think someone's living in" the barn. (Doc. 23-4 at 14.) Again, no evidence in support was provided, and no discussion beyond this single sentence ensued on this topic.

The evidence before the Council at the time of the denial at the June Council meeting was conjecture, without any support, that someone might be living in the barn.[4] Such unsubstantiated conjecture does not constitute substantial evidence. *See New Cingular Wireless PCS LLC*, 2024 WL 4507832, at *4 (stating the evidence supporting the government's decision must be substantial and substantiated). Therefore, Defendants' denial of the Application was not supported by

---

[4] Defendants incorrectly argue, "Whether someone resides in the property constitutes a dispute of material fact." (Doc. 23 at 20.) A fact is material if it "might affect the outcome of the suit under governing law." *Allen v. United States Postal Serv.*, 63 F.4th 292, 300 (5th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The issue before the Court is not whether someone resided in the barn at the time of the denial but whether the statements about the barn at the June Board meeting and the June Council meeting were substantial evidence supporting the Application's denial. Thus, whether someone actually resided in the barn is not an issue of material fact because the answer to that inquiry will not affect the Court's analysis or the outcome of the lawsuit. As explained above, only the information before the Council at the time of the denial is material to the substantial evidence review which, on this point, were vague and unsubstantiated statements that someone was or might be living in the barn.

substantial evidence, in violation of 47 U.S.C. § 332(c)(7)(B)(iii). Plaintiff is entitled to summary judgment on Count I of its *Complaint*.

3. Appropriate Relief

The remedy Plaintiff seeks is a judgment (1) declaring that Defendants violated 47 U.S.C. § 332(c)(7)(B)(iii); (2) directing Defendants to grant all permits and approvals necessary to erect the Proposed Tower; and (3) estopping Defendants from taking any action to prevent Plaintiff from constructing and operating the Proposed Tower. (Doc. 21 at 1–2.) When a governing body fails to comply with the TCA's "substantial evidence" provision, courts have found the proper remedy is "injunctive relief compelling the defendant to issue the requested permit." *New Cingular Wireless PCS LLC*, 2024 WL 4507832, at *5 (quoting *Tennessee ex rel. Wireless Income Props., LLC v. City of Chattanooga*, 403 F.3d 392, 399 (6th Cir. 2005) (collecting cases)). "Such relief 'best serves the TCA's stated goal of expediting resolution of this type of action.'" *Id.* (quoting *Verizon Wireless Personal Commc'ns, LP v. Harrison Cnty.*, No. 14-CV-389, 2015 WL 12564945, at *8 (S.D. Miss. Nov. 9, 2015)). The lack of substantial evidence in this case warrants an injunction requiring Defendants to permit construction of the Proposed Tower. *Verizon Wireless Personal Commc'ns, LP*, 2015 WL 12564945, at *8 (citing *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999)). Thus, the Court will grant the requested relief.[5]

## IV. Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion for Partial Summary Judgment* (Doc. 21) filed by Plaintiff New Cingular Wireless, PCS, LLC d/b/a AT&T Mobility is **GRANTED**. Consequently,

[5] Counts II and III in the *Complaint* seek the same declaratory and injunctive relief as Count I (*Compare* Doc. 1 at ¶¶ 85–86, *with* Doc. 1 at ¶¶ 98–99, 107–08), so this Ruling renders Counts II and III moot. *See New Cingular Wireless PCS LLC*, 2024 WL 4507832, at *6; *Alltel Corp.*, 466 F. Supp. 3d at 684 n.5.

judgment on Count I will be entered in AT&T's favor and its requests for declaratory and injunctive relief will be granted.

**IT IS FURTHER ORDERED** that Defendants Iberville Parish, Louisiana; Iberville Parish Government; Iberville Parish Council; and Parish President Chris Daigle shall issue the requested permit to AT&T as well as all other approvals necessary to allow for the construction of the proposed wireless telecommunications facility at 60375 Bayou Road, Plaquemine, Louisiana, 70764. Such permits and approvals shall be issued within 30 days after judgment is issued.

**IT IS FURTHER ORDERED** that Defendants Iberville Parish, Louisiana; Iberville Parish Government; Iberville Parish Council; and Parish President Chris Daigle are **ESTOPPTED** from taking any action to prevent AT&T from constructing and operating the proposed wireless telecommunications facility. *See New Cingular Wireless PCS LLC*, 2024 WL 4507832, at *6 (estopping defendants from preventing construction and operation of a proposed tower where plaintiff requested such relief after its application was denied without substantial evidence).

**IT IS FURTHER ORDERED** that Count II and Count III in the *Complaint for Equitable Relief, Declaratory Judgment, and Request for Expedited Review* (Doc. 1) are **DISMISSED AS MOOT**.

Signed in Baton Rouge, Louisiana, on September 14, 2026.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**